IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. DEDRICK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CLIFTON J. DEDRICK, APPELLANT.

Filed March 12, 2024.    No. A-23-312.

Appeal from the District Court for Buffalo County: JOHN H. MARSH, Judge. Affirmed.

Brian J. Davis, of Davis Law, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

WELCH, Judge.

## INTRODUCTION

Following a jury trial, Clifton J. Dedrick was convicted of two counts of possession of a firearm by a prohibited person. On appeal, he assigns errors relating to his motion to suppress, the jury instructions, and the sufficiency of the evidence to support his convictions. For the reasons stated herein, we affirm.

## STATEMENT OF FACTS

### FACTS LEADING TO ARREST

In 2020, Dedrick was convicted of domestic violence, disturbing the peace, and criminal trespass, and was sentenced to probation. The probation orders included provisions that required Dedrick to, among other things:

> [r]eport to the Probation Office as directed by the Court or Probation Office and permit the Probation Officer to visit his/her home[,] . . . [r]eport any changes of address immediately

- 1 -

to the Probation Officer[,] . . . [and] "[s]ubmit to [a] reasonable search and seizure of premises, person, or vehicle by or upon request of the probation officer."

Additionally, the probation orders required Dedrick to "submit to search of person, vehicle, or property at any time by the probation office or law enforcement officer." Dedrick signed the probation orders agreeing to the conditions of his probation.

Between December 9, 2020, and February 12, 2021, Dedrick failed to report to Probation for drug testing. After Dedrick's probation officer, Shane Vance, was unable to locate Dedrick, he placed Dedrick on abscond status. On February 12, while Vance was still attempting to locate Dedrick, he received information from another probation officer about an anonymous tip that Dedrick might have been "involved in some criminal activity, possession of firearms, as well as potentially [being in] possession of drugs at that time."

After receiving this information, Vance, accompanied by two other probation officers, conducted an unannounced visit to the basement apartment at Dedrick's mother's house, which Vance stated was the last address reported by Dedrick. We will refer to the basement apartment at Dedrick's mother's house as the "basement apartment."

During the unannounced visit on February 12, 2021, in order to enter the basement apartment, probation officers had to walk behind the house and through the back gate to an exterior door. After entering through the exterior door, there were stairs leading either downstairs to the basement apartment or upstairs. Vance testified that the door to the basement apartment was partially open and that Dedrick was "on the couch right next to the door." In response to the probation officers' request to enter the basement apartment, Dedrick, who was dressed in a pair of mesh shorts and a T-shirt, responded that he "need[ed] to get some clothes on." Vance told Dedrick that he could get dressed but that Vance needed to accompany him due to safety concerns including information that firearms and drugs might be located in the basement apartment. According to Vance, Dedrick stepped back from the door and allowed him to enter. While Dedrick put on jeans, Vance observed what appeared to be the stock of a rifle leaned up on a wall next to the bed. After securing the rifle and requesting assistance from local law enforcement, the probation officers asked Dedrick if there were any other firearms in the residence. According to Vance, Dedrick responded that there was a handgun in one of the dresser drawers. Probation officers located two additional firearms in the dresser drawers and located another rifle in the utility closet.

In response to the probation officers' request for assistance, Sergeant Ryan Ohri arrived at the scene, arrested Dedrick, and seized the four firearms: an AR-15 platform semiautomatic rifle, a .9 millimeter handgun, a .22 caliber revolver, and a .243 caliber bolt-action rifle with a scope, as well as a large quantity of ammunition. Dedrick, who had previously been convicted of a felony, was charged with four counts of possession of a firearm by a prohibited person, Class ID felonies. See Neb. Rev. Stat. § 28-1206(3)(b) (Cum. Supp. 2022).

MOTION TO SUPPRESS

In May 2021, Dedrick filed a motion to suppress all evidence obtained and statements made as a result of the search of the basement apartment, on the basis that the probation officers did not have reasonable suspicion to contact him nor to search his property and that he was not properly

or timely advised of his constitutional rights. During the suppression hearing, testimony was received from Vance, Sergeant Ohri, and Dedrick.

During the suppression hearing, Vance testified that Dedrick was placed on his probation caseload in July 2020. Although the probation orders indicated that Dedrick's address was 1319 Avenue E., the following month, Dedrick informed Vance that due to an argument with his ex-wife, he would be temporarily staying in the basement apartment. Dedrick stated that in October 2020, he informed Vance that he resumed living with his ex-wife. According to Dedrick, their lease expired about a month later and at that time, he moved to Lexington, Nebraska, for a new job, and his ex-wife moved into the basement apartment. Vance testified that during an interaction with Dedrick at Cabela's in December 2020, Dedrick mentioned a job opportunity, but Dedrick did not inform Vance that he had moved from the basement apartment, nor did he provide any information regarding a new address in Lexington or anywhere else.

The district court overruled Dedrick's motion stating:

> The Court declines to . . . limit Probation's activities to the address that's listed on their probation order. I think that would be contrary to considerations of rehabilitation and protection of public safety to limit Probation's ability to search just to what's provided by the defendant or the probationer.
>
> . . . that it was reasonable for . . . Vance to expect [Dedrick] to be there, went there with an attempt to get him into compliance.
>
> . . . [I] find the probation officer's testimony credible, that he had . . . contact there and discussed . . . the manner of entry and maintaining a separate door. Find the probation officer's testimony credible, that he observed . . . Dedrick on the couch, observed him stand up; heard another Probation Officer . . . ask [Dedrick] if we can come in; and that [Dedrick] asked to be allowed to dress and stepped back from the door, at least implicitly inviting or allowing . . . Vance to come into the residence and observe . . . Dedrick put on clothing, during which time . . . Vance observed . . . a rifle stock in the part of the residence.
>
> And I think then Probation would be reasonably allowed to make a search of the surroundings for their immediate safety. I do find that . . . Dedrick's stepping back from the door after being allowed to dress was essentially submitting to . . . Vance's entry into the premises; and that the search was then pursuant to the search clause of probation, and that . . . a probation search is an exception to the warrant requirement.

TRIAL

The jury trial was held over three days in March 2022. Testimony was received from witnesses including Vance; Sergeant Ohri; Marissa Dedrick, Dedrick's ex-wife; Dedrick's roommate; and Dedrick's mother, stepfather, and sister. We relate only those portions of testimony that are relevant to this appeal.

Testimony adduced from probation and law enforcement officers was consistent with the facts as previously set forth. Additional evidence included testimony from Dedrick's mother, stepfather, sister, and ex-wife, who all testified that at the time probation officers conducted the February 12, 2021, unannounced visit, Dedrick was living with a roommate in Lexington,

Nebraska, not in the basement apartment. However, Dedrick's roommate testified that Dedrick had moved out of the Lexington property at the beginning of February, had moved back into the basement apartment, and specifically stated that Dedrick was not living with him in Lexington on February 12.

Marissa testified that, although she and Dedrick divorced in 2018, they lived together until August 2020 when, due to relationship issues, she moved into the basement apartment. She testified that, although she did not usually store firearms in the basement apartment, on February 11, 2021, she picked up her firearms from the individual who was storing them at that individual's request. She testified that she drove an hour and a half round-trip during a winter storm to pick up the firearms. Marissa testified that she did not know that Dedrick was going to be at the basement apartment, nor did she know that he stayed the night. Dedrick's mother testified that she was in the basement apartment almost daily with her grandchildren and that she had not seen any firearms in the basement apartment.

Dedrick's mother, stepfather, and sister, further testified that Dedrick did not come to the mother's home regularly because he did not have a vehicle and he primarily relied on others to drive him places. Dedrick's sister also testified that she worked with Dedrick in Lexington and on February 11, 2021, the night before his arrest, she drove both herself and Dedrick to their mother's home.

JURY INSTRUCTION CONFERENCE

During the jury instruction conference, Dedrick's counsel objected to the district court's proposed instruction No. 5 which provided, consistent with NJI 2d Crim. 4.2, that "'Possession of a firearm' means either knowingly having it on one's person or knowing of the object's presence and having control over the object."

Dedrick requested that the court's instruction on the definition of possession also include the definition defined in *State v. Warlick*, 308 Neb. 656, 956 N.W.2d 269 (2021), which set forth that "constructive possession may be proved by mere ownership, dominion, or control over contraband itself, coupled with the intent to exercise control over the same." Dedrick's counsel argued that because the charges against Dedrick were grounded in constructive possession, he was entitled to a definitional instruction which included an expression that "constructive possession needs to be coupled with the intent to exercise control of the same." In response, the district court stated:

> I do note that 4.2 has in parentheses, possession or constructive possession. . . . so I think it envisions that the title could be constructive possession. I guess I would be open to having a separate instruction that says, possession or constructive possession, and then having possession of a firearm, the same language, as a separate, stand-alone instruction with the title of possession, constructive possession, as listed in 4.2.
>
>  . . . .
>
>  . . . [T]hat's the only place that constructive possession appears, is in the title in parentheses. I don't know that it adds much. So I'll note the requested instruction by [defense counsel]. I think I'm going to stick with NJI and just leave it in the definitions.

VERDICT

Following the trial, the jury found Dedrick guilty of two of the four counts of possession of a firearm by a prohibited person. The district court sentenced Dedrick to 20 to 40 years' imprisonment with 3 years as a mandatory minimum on each conviction. The court granted Dedrick credit for 104 days served and ordered his sentences to run concurrently. Dedrick has timely appealed and is represented in this direct appeal by new counsel.

ASSIGNMENTS OF ERROR

Dedrick's assignments of error, restated, are that: (1) the district court erred in overruling his motion to suppress; (2) the district court committed plain error in instructing the jury on constructive possession; and (3) the evidence was insufficient to support his convictions.

STANDARD OF REVIEW

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Simons*, 315 Neb. 415, 996 N.W.2d 607 (2023). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id*. Whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id*.

Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Tvrdy*, 315 Neb. 756, 1 N.W.3d 479 (2024).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Turner*, 315 Neb. 661, 998 N.W.2d 783 (2024). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

ANALYSIS

MOTION TO SUPPRESS

Dedrick first assigns that the district court erred in overruling his motion to suppress, which resulted in evidence from an illegal search to be admitted at trial.

Here, the facts demonstrate that the probation officers conducted a warrantless search of the basement apartment where Dedrick was present. But, as the Nebraska Supreme Court held in *State v. Simons*, 315 Neb. 415, 423-24, 996 N.W.2d 607, 615-16 (2023):

> The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution prohibit unreasonable searches and seizures. Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment generally cannot be used in a criminal proceeding against the victim of the illegal search and seizure.

> Whether a search is reasonable is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to

which it is needed for the promotion of legitimate governmental interests. While searches and seizures conducted pursuant to a warrant supported by probable cause are generally considered reasonable, warrantless searches are considered per se unreasonable, subject to only a few specific exceptions that must be strictly confined by their justifications.

One exception to the warrant requirement is "when 'special needs,' beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." A probation setting is an example of such a special need. This court has held that "'conditions in probation orders requiring the probationer to submit to warrantless searches, to the extent they contribute to the rehabilitation process and are done in a reasonable manner, are valid and constitutional.'"

Another recognized exception to the warrant requirement is a search undertaken with consent. To be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice, and not the product of a will overborne. Consent must be given voluntarily and not as a result of duress or coercion, whether express, implied, physical, or psychological.

In his argument, Dedrick acknowledges the "special needs" exception to the warrant requirement and appears to acknowledge that "conditions in probation orders requiring . . . probationers to submit to warrantless searches, to the extent that they contribute to the rehabilitation process and are done in a reasonable manner, are valid and constitutional" and fall within the "special needs" exception. Brief for appellant at 15. Instead, as we understand his argument, Dedrick asserts that (1) the search was invalid because it was performed at the basement apartment, which was a different location than the address listed in the original probation orders; (2) the terms of the probation orders required that probation officers first obtain consent before searching a probationer's residence and no such consent was obtained in this case; and (3) the search itself was not done in a reasonable manner and did not contribute to the rehabilitation process.

As to Dedrick's contention that a probationary warrantless search is limited to the address listed in the probation orders, we reject that contention. At the time of the current offenses, Dedrick was on probation for his prior convictions for domestic violence, disturbing the peace, and criminal trespass. The probation orders required Dedrick, inter alia, to submit to the reasonable search and seizure of his premises, person, or vehicle by or upon request of the probation officer. Dedrick signed both probation orders. These orders, on their face, did not limit Dedrick's submission to searches to the original address listed in the orders, but to his premises in general. After reviewing the evidence, which included but was not limited to Vance's testimony that Dedrick's last communication to him was that Dedrick was living in the basement apartment, which was where probation officers located Dedrick after he failed to report and was placed on "abscond status," we find no clear error associated with the district court's finding that Dedrick submitted to a reasonable search of those premises and no separate warrant was required to search the basement apartment.

Dedrick next argues that even if the search of the basement apartment was a "premises" within the context of the probation orders, a search of the premises still required his consent, which

he did not provide. Again, we reject this argument. A similar argument was made and rejected by this court in *State v. Davis*, 6 Neb. App. 790, 577 N.W.2d 763 (1998) wherein we held:

Contrary to [the defendant's] position, it is clear that the Supreme Court's ruling [in *State v. Morgan*, 206 Neb. 818, 819, 295 N.W.2d 285, 286 (1980)] was not dependent on [a defendant's] purported consent at the time of the search. Other courts addressing similar language have also concluded that consent at the time of the search is not necessary if the terms of the probation or parole permit warrantless searches. In *Rowe v. Lamb*, 130 F.3d 812 (8th Cir. 1997), a probation order required the defendant to submit to warrantless searches. The jailed defendant denied the probation officer consent to search his apartment; but the jailer gave the probation officer the keys, and a search was conducted. The defendant filed an action pursuant to 42 U.S.C. § 1983 (1994) against the jailer. The court found no constitutional violation because the search was valid pursuant to the terms of the probation order. In *U.S. v. Hill*, 967 F.2d 902 (3d Cir. 1992), the court found no evidence that the defendant had agreed to a warrantless search or that a warrantless search was an express condition of the parole agreement. Notwithstanding, the court upheld the search, citing the "'special needs'" of the parole system. *Id*. at 909. In *Patterson v. Bd. of Probation and Parole*, 851 F. Supp. 194 (E.D. Pa. 1994), the defendant brought a § 1983 claim. The court held that there had been no constitutional violation and found that the defendant had consented to the search when he signed the parole agreement. In *State v. Martinez*, 811 P.2d 205 (Utah App. 1991), the terms of the probation agreement required the defendant to allow the Department of Corrections to search his residence without a warrant upon reasonable suspicion. The court rejected the defendant's argument that he had to be present and give actual consent, stating such an interpretation would "nullify such provisions in probation agreements, making such provisions merely 'agreements to agree.'" *Id*. at 209. Contra *Com. v. Pickron*, 535 Pa. 241, 634 A.2d 1093 (1993) (holding that in absence of statutory scheme, actual consent was needed).

In the present case, we find that the warrantless search of [the defendant's] apartment was permitted by the terms of his parole agreement and fell within the "special needs" exception to the Fourth Amendment.

The probation orders at issue herein did not require Dedrick's consent prior to any individual search but instead constituted a blanket consent to reasonable searches and seizure "by or upon request of the probation officer." On this record, when the probation officers arrived at the basement apartment, they requested entry to search the premises. Dedrick backed away from the door and, while Dedrick was putting on jeans, Vance observed the first weapon. We find no error associated with this portion of Dedrick's assignment of error.

Dedrick also argues that the particular search conducted herein did not contribute to the rehabilitative purposes of his probation and was patently unreasonable because he was not on probation for any weapons violations. We disagree. The Nebraska Supreme Court addressed a similar argument in *State v. Green*, 287 Neb. 212, 223, 842 N.W.2d 74, 87 (2014), stating:

[The defendant] also argues that the search condition was not related to the rehabilitative purposes of his probation because he was not convicted of a weapons

violation. But state law prohibits all felons, regardless of the underlying felony, from possessing a weapon, and [the defendant's] probation order specifically noted that he was not to possess illegal weapons. The search condition is related to this prohibition.

Similarly, Dedrick's probation order provided that Dedrick was required to refrain from unlawful conduct and not commit any law violations. Because Dedrick had previously been convicted of a felony, his possession of a firearm violates the law. As such, the search, which was instituted, at least in part, on an anonymous tip that Dedrick was in possession of a weapon or drugs, contributed to the rehabilitative purposes of his probation.

To the extent that Dedrick separately argues that even if the search served a valid rehabilitative purpose, it was conducted unreasonably, we reject that contention as well. As the State notes in its brief, the U.S. Supreme Court explained in *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987):

> Probation, like incarceration, is "a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty[]" [and] . . . [t]o a greater or lesser degree, it is always true of probationers (as we have said it to be true of parolees) that they do not enjoy "the absolute liberty to which every citizen is entitled, but only ... conditional liberty properly dependent on observance of special [probation] restrictions." *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S. Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

The Court went on to explain that, while probation searches are still subject to a "reasonableness" standard, such searches do not require the presence of probable cause or a warrant, which would hinder probation officers' ability to carry out such searches and defeat the deterrent effect of such searches. The Court explained that

> . . . it is both unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts. In some cases—especially those involving drugs or illegal weapons—the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society. The agency, moreover, must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances.
>
> To allow adequate play for such factors, we think it reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search. The same conclusion is suggested by the fact that the police may be unwilling to disclose their confidential sources to probation personnel. For the same reason, and also because it is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law, we think it enough if the information provided indicates, as it did here, only the likelihood ("had or might have guns") of facts justifying the search.

*Griffin v. Wisconsin*, 483 U.S. at 879-80.

Here, in the months leading up to February 12, 2021, Dedrick had failed to report to Probation and had been listed on the "abscond" status list. Separately, Probation had received an anonymous tip that Dedrick was now housing guns and drugs. As the U.S. Supreme Court noted, "it reasonable to permit information provided by a police officer, whether or not on the basis of firsthand knowledge, to support a probationer search." *Id.*, 483 U.S. at 879-80. We reject Dedrick's generalized claim that the nature of this search was patently unreasonable. Dedrick's failure to report to his probation officer, his abscond status, and the unsubstantiated tip regarding drugs and firearms being present at the basement apartment, which was the address last provided by Dedrick, gave the probation officers reasonable grounds to search the basement apartment, and we find nothing in the record to suggest the search was unreasonably conducted. This assignment of error fails.

## JURY INSTRUCTIONS

Dedrick next contends that the district court erred in rejecting his proposed jury instruction on constructive possession related to firearms.

As the Nebraska Supreme Court stated in *State v. Parnell*, 294 Neb. 551, 575-76, 883 N.W.2d 652, 671 (2016):

> To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error necessitating reversal.

In this case, the district court instructed the jury on the material elements of possession of a firearm by a prohibited person as follows: (1) that the defendant was in possession of a firearm, which is specifically set forth; (2) the defendant was a prohibited person having been previously convicted of a felony; (3) the defendant did so on or about February 12, 2021; and (4) the defendant did so in Buffalo County, Nebraska. This language tracks with the statutory language of § 28-1206. As it relates to the word "possession" within the instruction, the district court provided a definitional instruction that tracks with pattern jury instruction NJI 4.2, which provides: "'Possession of a firearm' means either knowingly having it on one's person or knowing of the objects presence and having control over the object."

Dedrick argues that this instruction is insufficient because it excludes the word "intent." Dedrick proffered that the portion of the instruction which reads "having control over the object" should provide "having an intent to exercise control over the object." This specific issue deals with the doctrine of constructive possession. That doctrine has been extended to the offense of possession of a firearm by a prohibited person under § 28-1206. *State v. Samuels*, 31 Neb. App. 918, 991 N.W.2d 900 (2023); *State v. Sherrod*, 27 Neb. App. 435, 932 N.W.2d 880 (2019).

- 9 -

In furtherance of his argument, Dedrick asserts that the Nebraska Supreme Court previously adopted the definition of constructive possession in *State v. Schuller*, 287 Neb. 500, 843 N.W.2d 626 (2014), and *State v. Warlick*, 308 Neb. 656, 956 N.W.2d 269 (2021), and that the pattern instruction departs from the definition set forth in those cases.

In *Schuller*, the Nebraska Supreme Court explained the doctrine of "constructive possession" as follows:

> Black's Law Dictionary defines "possess" as "[t]o have in one's actual control; to have possession of." It defines "possession" to include, among other things, both actual and constructive possession, and our common law similarly recognizes both. Actual possession is synonymous with physical possession. *Constructive possession, however, may be proved by mere ownership, dominion, or control over contraband itself, coupled with the intent to exercise control over the same.*

*State v. Schuller*, 287 Neb. at 510, 843 N.W.2d at 634 (emphasis added). See also *State v. Warlick, supra* (constructive possession may be proved by mere ownership, dominion, or control over contraband itself, coupled with intent to exercise control over same).

In short, Dedrick argues that pattern jury instruction 4.2 provides an inaccurate definition of "constructive possession" because it does not track with the definition approved in *Schuller* and *Warlick* which includes the word intent. We disagree. This court has previously addressed the validity of pattern jury instruction 4.2 in *State v. Garza*, 29 Neb. App. 223, 952 N.W.2d 734 (2020); *State v. Valentine*, 27 Neb. App. 725, 936 N.W.2d 16 (2019); and *State v. Castellanos*, 26 Neb. App. 310, 918 N.W.2d 345 (2018).

Most notably, in *State v. Valentine, supra*, the trial court similarly instructed the jury regarding the specific elements the State needed to prove in order to find the defendant guilty of possession of a deadly weapon by a prohibited person:

> The portion of jury instruction No. 6 at issue reads as follows: "The elements of the crime of Possession of a Deadly Weapon (Firearm) by a Prohibited person, as charged in Count 2 of the Information, are: 1. That the defendant did possess a deadly weapon to [sic] specifically: a firearm; and 2. That the Defendant did so on or about October 12, 2017[,] in Douglas County, Nebraska; and 3. That the Defendant had previously been convicted of a felony.

*State v. Valentine*, 27 Neb. App. at 744, 936 N.W.2d at 30. The defendant argued that the instruction should have read "'the defendant did knowingly or intentionally possess a deadly weapon.'" *Id*. But, in addressing that argument, this court found that "'[i]n giving instructions to the jury, it is proper for the court to describe the offense in the language of the statute.'" *State v. Valentine*, 27 Neb. App. at 745, 936 N.W.2d at 30-31 (2019) (quoting *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018)). And, when read together with jury instruction No. 9, which provided a definition of "possession," and which was patterned after NJI Crim. 4.2, we stated that "[w]hen looking at the jury instructions as a whole, it is clear that jury instruction No. 9 explains the requisite intent necessary to establish whether [the defendant] was in possession of the deadly weapon." *State v. Valentine*, 27 Neb. App. at 745, 936 N.W.2d at 31. We went on to hold:

Moreover, we note that [the defendant] cannot show that he was in any way prejudiced by the district court's decision to give jury instruction No. 6 without the amendments requested by [the defendant.] When looking at the jury instructions as a whole, it is clear that jury instruction No. 9 explains the requisite intent necessary to establish whether [the defendant] was in possession of the deadly weapon. As such, jury instruction No. 9 provides the information that [the defendant] asked the district court to include in jury instruction No. 6. Accordingly, it is clear that the jury was adequately instructed regarding the elements of possession of a deadly weapon by a prohibited person.

*State v. Valentine*, 27 Neb. App. 725, 745, 936 N.W.2d 16, 31 (2019). Finally, we held:

Here, the district court used a pattern jury instruction regarding the definition of possession. See NJI2d Crim. 4.2. Whenever an applicable instruction may be taken from the Nebraska Jury Instructions, that instruction is the one which should usually be given to the jury in a criminal case. *State v. Morgan*, 286 Neb. 556, 837 N.W.2d 543 (2013). In fact, recently, in *State v. Castellanos*, 26 Neb. App. 310, 918 N.W.2d 345 (2018), this court upheld a jury instruction defining possession which was directly patterned after NJI2d Crim. 4.2. In *Castellanos*, the defendant requested that the district court include the following language when instructing the jury regarding the definition of possession: "'The Defendant's mere presence in an area where items were ultimately discovered is not enough to establish that the defendant was in "possession" of said items.'" 26 Neb. App. at 326, 918 N.W.2d at 358. The defendant also requested that the court instruct the jury as follows: "'Assuming an item is not found on the defendant's person, the defendant's proximity to the item, standing alone, is insufficient to prove "possession."'" *Id.* We affirmed the district court's decision to rely on the pattern jury instruction defining the term "possession" rather than using the defendant's proposed definition.

As in *State v. Castellanos, supra*, [the defendant] asked the district court to depart from the pattern jury instruction and provide the jury with a more detailed definition of possession. Although [the defendant's] proposed jury instruction No. 9 was not an incorrect statement of the law, [the defendant] cannot show that he was prejudiced by the district court's refusal of his proposed jury instruction. When the instructions given are considered together, it is clear that the district court properly instructed the jury on the definition of the term "possession," and the court did not err in refusing to give Valentine's proposed jury instruction.

*State v. Valentine*, 27 Neb. App. at 746-47, 936 N.W.2d at 31-32.

Based upon the foregoing authority, we have already found that the jury instructions provided by the district court in the instant case, when considered together, explained the requisite intent necessary to establish whether Dedrick was in possession of the deadly weapon. See *State v. Valentine*, 27 Neb. App. at 745, 936 N.W.2d at 31 (when looking at jury instructions as whole, it is clear that jury instruction No. 9 explains requisite intent necessary to establish whether defendant was in possession of deadly weapon). As such, Dedrick's argument that jury instruction No. 5 does not adequately set forth the requisite intent necessary to find possession fails.

Dedrick's final assignment of error is that the district court erred in finding that the State's evidence was sufficient to support his two convictions of possession of a firearm by a prohibited person. Because Dedrick acknowledges that he had previously been convicted of a felony, we limit our analysis to his claim that there was no evidence he had any control or dominion over the basement apartment or the firearms found therein. More specifically, Dedrick argues that there was no evidence that he resided in the basement apartment; that the evidence showed he had been staying out-of-town but had spent the night at the basement apartment after he got off work on February 11, 2021; that his ex-wife admitted she was residing in the basement apartment with her two children; and that his ex-wife admitted ownership of the firearms found in the basement apartment.

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Tvrdy*, 315 Neb. 756, 1 N.W.3d 479 (2024).

Dedrick was convicted of two counts of possession of a firearm by a prohibited person under § 28-1206, which provides that a person commits the offense of possession of a deadly weapon by a prohibited person if he or she possesses a firearm and has previously been convicted of a felony. As we noted, Dedrick admits that he has previously been convicted of a felony. Thus, we consider whether the evidence, when viewed in the light most favorable to the State, established beyond a reasonable doubt that Dedrick possessed the firearms.

Here, the evidence adduced at trial, when viewed in the light most favorable to the State, established that Dedrick had not reported to Probation since early December 2020 and had been placed on abscond status. On February 12, 2021, probation officers went to the basement apartment, which was Dedrick's last known address, after receiving an anonymous tip that Dedrick might be in possession of drugs and firearms at that location. When probation officers arrived at the basement apartment, Dedrick was asleep on the couch and was the only individual present. Although Dedrick denied living at the basement apartment, articles of clothing located in the basement apartment included men's shirts and jeans consistent with Dedrick's size and Dedrick's cigarettes were on the dresser in which two handguns were later discovered. Vance stated that all of Dedrick's belongings were located in the basement apartment and that Dedrick admitted knowing of the presence of the firearms but stated that was why he was sleeping on the couch. Additionally, Dedrick's prior roommate testified that at the beginning of February 2021, Dedrick moved out of their shared residence in order to move back into the basement apartment to be closer to his children and that Dedrick was no longer living with him on February 12, 2021.

Further, while in the basement apartment, Vance observed a firearm, and after Dedrick informed probation officers of the presence of at least one other firearm in a dresser drawer,

probation officers located and seized a total of four firearms. Dedrick informed Probation that the firearms belonged to his ex-wife who had been residing in the basement apartment. Vance testified that the rifle was next to the bed and that the dresser where two handguns were found was about four feet away from the bed. And although Marissa acknowledged ownership of the firearms, Sergeant Ohri testified that Marissa's claims of ownership of the firearms were suspicious because she referred to the firearms as "shotguns" even though two of the firearms were rifles and the other two were handguns. Sergeant Ohri noted that, generally, firearm purchasers immediately know the difference between a rifle and shotgun.

As defined earlier, possession means either knowingly having an object on one's person or knowing of the object's presence and having control over the object. The evidence presented by the State supported the jury's determination, beyond a reasonable doubt, that Dedrick knew that firearms were located in the basement apartment and that he had control over them. Accordingly, the evidence supported the jury's determination that Dedrick was guilty of two counts of possession of a firearm by a prohibited person.

## CONCLUSION

For the reasons stated herein, we affirm Dedrick's convictions and sentences.

AFFIRMED.